IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

Janice M. Dietz,                    )
                                    )
        Plaintiff,                  )
                                    )    CAUSE NO:   2:11-cv-0442
        vs.                         )
                                    )
Carolyn Colvin, Commissioner of     )
Social Security[1],                 )
                                    )
        Defendant.                  )


REPORT AND RECOMMENDATION

This matter is before the court on the petition for judicial

review of the decision of the Commissioner of Social Security

filed by the claimant, Janice M. Dietz, on June 21, 2012.  For

the reasons set forth below, the court RECOMMENDS that the

decision of the Commissioner be AFFIRMED.

BACKGROUND

The claimant, Janice M. Dietz, applied for Disability

Insurance Benefits and Supplemental Security Income on December

31, 2007, alleging a disability onset date of December 4, 2007.

(Tr. 139)  Her claims initially were denied on July 23, 2008, and

again denied upon reconsideration on October 17, 2008.  (Tr. 79,

---

[1]     On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), Carolyn W. Colvin is automatically
substituted for Michael J. Astrue as the named Defendant.

86) Dietz requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 93) A hearing before ALJ Barbara J. Welsch was held on June 8, 2008, at which Dietz, vocational expert ("VE") Randall L. Harding, and a witness, William R. Madden testified. (Tr. 18)

On July 28, 2010, the ALJ issued her decision denying benefits. (Tr. 69) The ALJ found that Dietz was not under a disability within the meaning of the Social Security Act from December 4, 2007, through the date she issued her decision. (Tr. 68) The Appeals Council denied review of the ALJ's decision on July 19, 2011. (Tr. 5) After an extension of time was granted by the Appeals Council on October 25, 2011, Dietz filed her complaint with this court. (Tr. 3)

Dietz was born on June 30, 1962, making her 48 years old on the date of the ALJ's decision. (Tr. 139) She is 5'2" tall and weighs approximately 122 pounds. (Tr. 19) Dietz is single with no children. (Tr. 19) At the time of the hearing, she resided with her fiancé and his 18 year old son. (Tr. 19) Dietz has a 12th grade education and attended two years of college to obtain her teacher aide certificate. (Tr. 21, 61) She last worked as a teacher at Sunshine Preschool and Day Care in Fisher, Illinois. (Tr. 22, 250) She only worked there a couple of months before she was fired. (Tr. 22) Prior to that, she worked at Hugs and

Snugs Day Care in Calumet City, Illinois as a teacher aide for infants. (Tr. 22, 250) She worked there for 2 ½ years before quitting to work at Sunshine Preschool. (Tr. 22) Prior to that, she worked as a teacher aide for Homewood Children's center for 2 years before being fired. (Tr. 23) Her employment prior to that was with the Village of Lansing as a crossing guard. (Tr. 22, 250) She began working there in 1994 and was fired in 2002. (Tr. 250)

On December 4, 2007, Dietz went to Champaign County Christian Health Center and was seen by Dr. Walter Gonzalez. (Tr. 251, 264) During this visit, Dietz requested medication to address "her nerves" and told Dr. Gonzalez that she felt anxious, had trouble focusing, and could not keep a job. (Tr. 251, 264) Dr. Gonzalez's notes reflected that during the interview, Dietz spoke loudly and exhibited signs of paranoid ideation although she did not appear delusional. (Tr. 251, 264) Dr. Gonzalez was unsure whether the diagnosis was Attention Deficit Hyperactive Disorder ("ADHD") or bipolar disorder, but he noted that ADHD was more likely. (Tr. 251, 264) Dr. Gonzalez prescribed Dietz Ritalin and referred her to psychiatry. (Tr. 251, 264)

An undated note from the Licensed Clinical Social Worker at Champaign County Christian Health Center stated that Dietz crashed on Ritalin. (Tr. 251, 263) Dietz reported that she was

acting crazy, crying, and emotionally distressed. (Tr. 251, 263)
Her boyfriend insisted that she get off Ritalin, and a referral
was made to Dr. Welch. (Tr. 251, 263) Dr. Welch subsequently
saw Dietz and documented that the medication did not work and
that Dietz had an acute manic episode. (Tr. 252, 263) Dr. Welch
stated that Deitz needed a "psych visit." (Tr. 252, 263) Dietz
was prescribed Valium and was instructed not to follow up with
anyone but the psychiatry department. (Tr. 252, 263)

On February 12, 2008, Dietz went to the Frances Nelson
Health Center for a medical evaluation. (Tr. 252, 269) She was
examined by family medicine physician, Dr. Corinne Kohler. (Tr.
252, 269) Dr. Kohler recorded that Dietz exhibited rapid
tangential speech with run-on sentences. (Tr. 252, 269) It also
was noted that she had seen Dr. Welch at the Champaign County
Christian Health Center and that he had prescribed Lexapro, which
Dietz stated "made things worse" and "amplified" her symptoms.
(Tr. 252, 269) Dietz had complaints of not being able to hold a
job, extreme anxiety, speaking loudly, interrupting others, and
appetite issues. (Tr. 269) Dr. Kohler diagnosed Dietz with
bipolar disorder and reported that she probably needed to be
medicated accordingly. (Tr. 252, 269)

On February 14, 2008, Dietz saw Dr. Linus Anukwu at Provena
Covenant to establish care as her primary physician. (Tr. 252,

280) Dietz complained of a lump in her left axilla. (Tr. 252, 282) Dr. Anukwu's diagnosis was Furunculosis, and he informed Dietz that her symptoms were a result of using multiple blades for shaving. (Tr. 252, 282) Dr. Anukwu instructed Dietz to use Tylenol or Motrin for the pain. (Tr. 252, 282)

On March 3, 2008, Dietz spoke to Ann Russell, a licensed clinical social worker at Frances Nelson. (Tr. 291) Russell noted that Dietz wanted medicine and that she was experiencing racing thoughts. (Tr. 291) She also recorded that Dietz did not have an anger issue and that she had probable bipolar disorder. (Tr. 291)

On March 13, 2008, Dietz followed up with Dr. Kohler at Frances Nelson. (Tr. 252, 290) She decided not to return to Dr. Welch at the Champaign County Christian Health Center and instead chose to utilize the mental health services at Frances Nelson. (Tr. 252, 290) She had stopped taking Lexapro and was not taking any medications. (Tr. 252, 290) Dr. Kohler's diagnosis was bipolar disorder, and he started Dietz on a trial of Depakote to help relieve some of her depressive symptoms and slow down her anxiety. (Tr. 252, 290)

On April 14, 2008, Dietz saw Mary McGuire at Frances Nelson. (Tr. 252, 300) Dietz reported to her that the Depakote was not working and that she still was fairly hyper and anxious. (Tr.

252, 300)  McGuire observed that Dietz was anxious and talking
constantly.  (Tr. 300)  Dietz stated that she could not hold a
job because she was extremely anxious.  (Tr. 300)  McGuire's
diagnosis of Dietz was bipolar disorder and her medications were
increased.  (Tr. 252, 300)

During the same period that Dietz was seeking treatment for
her psychiatric symptoms, she also was experiencing issues with
her left shoulder.  (Tr. 252, 314)  On April 15, 2008, Dietz
underwent an x-ray and examination of her left shoulder at
Provena Covenant, which revealed degenerative changes of the
glenohumeral joint in her left shoulder.  (Tr. 252, 314)  On
April 30, 2008, Dietz went to Provena Covenant to undergo
Magnetic Resonance Imaging ("MRI") of her left shoulder, which
showed findings consistent with a full thickness partial tear of
the supraspinatus tendon as well as probable degenerative cysts
in the inferior and posterior aspect of the glenoid and proximal
humerous.  (Tr. 252, 315)

On April 28, 2008, Dietz saw Russell at Francis Nelson.
(Tr. 252, 299)  Russell documented that Dietz felt like the
Depakote was not helping and that she still talked constantly and
had a lot of anxiety.  (Tr. 252, 299)  Russell told Dietz that
the Depakote probably was not the answer for the long-term, but
to give it some more time.  (Tr. 299)

Dietz saw Dr. Kohler at Frances Nelson on May 20, 2008.
(Tr. 252, 368)  Dietz stated that the Depakote was causing her to
be more hyper.  (Tr. 252, 368)  Dr. Kohler noted that Dietz was
very hyper and not completing her sentences.  (Tr. 252-53, 368)
Dr. Kohler also recorded that Dietz's speech was somewhat
tangential and that she was very difficult to make eye contact
with.  (Tr. 253, 368)  Dr. Kohler's diagnosis was bipolar
disorder.  (Tr. 253, 368)  Dr. Kohler prescribed Seroquel and
made arrangements for Deitz to see psychiatrist Dr. Graum Derum.
(Tr. 253, 368)

Also on May 20, 2008, Dietz saw Dr. Kavitha Raman at Provena
Covenant in regard to pain in her right wrist.  (Tr. 253, 333)
Dietz stated that she had a severe pain in her right wrist and
that the intensity was a nine out of ten.  (Tr. 253, 333)  She
explained that the pain started suddenly and that she was unable
to work at her daycare job.  (Tr. 253, 333)  It was noted that
she had a history of bipolar disorder, and blood chemistries and
x-rays were ordered.  (Tr. 253, 333)  X-rays of her right wrist
and hand were completed on May 21, 2008, and the results were
normal.  (Tr. 253, 332)  Her CBC, CMP, vitamin B12 level, and
rheumatoid factor taken on May 21, 2008 were all normal.  Her
folic acid level was low at 5.11.  (Tr. 332)  Dr. Raman informed
Dietz that her low folic acid level could be contributing to her

symptoms of pain in her right wrist. (Tr. 332)  Dr. Raman recommended that she start taking folic acid supplements and have a follow-up folic acid level and fasting lipid panel done in two months. (Tr. 332)

Dietz underwent a psychological evaluation and mental status examination on May 21, 2008, by Dr. William Kohen. (Tr. 253, 306)  Dr. Kohen documented that it appeared that Dietz had a history of attention deficit, hyperactivity, and "manicky/depressive" feelings. (Tr. 253, 308)  She initially was treated for psychiatric problems in 2003 with the use of psychotropic medication, which was not helpful. (Tr. 253, 308)  Dr. Kohen also noted that Dietz continued to experience psychiatric symptoms that were present for an extended period of time. (Tr. 253, 308)  Dr. Kohen documented that Dietz had a poor work history as she had been fired on more than one occasion. (Tr. 253, 308)  Dr. Kohen determined that Dietz had adequate memory and overall comprehension. (Tr. 253, 308)  Dr. Kohen also noted that Dietz could not sustain concentration and that her social interactions were marked by her excessive speech and interruption of conversations along with anxiety and feeling that people around her were talking about her. (Tr. 253, 308)  Dr. Kohen also recorded that Dietz's persistence and adaptablity was limited by her psychiatric problems. (Tr. 253, 308)  His

diagnoses included the following:  1) ADHD; 2) bipolar disorder; and 3) generalized anxiety disorder or social anxiety.  (Tr. 253, 309)

On May 22, 2008, Dietz saw Patricia Finegan, APN, at Provena Covenant regarding her left shoulder pain.  (Tr. 253, 327)  She complained of left shoulder pain which had been present for the past 10 years and right wrist pain that had been present for the past 2 months.  (Tr. 253, 324)  Finegan's diagnoses were 1) left shoulder pain; 2) adhesive capsulitis, left shoulder; 3) right wrist pain, unclear etiology; and 4) partial tear of the supraspinatus tendon, left shoulder.  (Tr. 253, 326) Finegan instructed Dietz to continue physical therapy and come back for a check-up in 6 weeks.  (Tr. 253, 326)

Dietz followed up at Frances Nelson and stated that she had stopped taking the Seroquel because it made her drowsy.  (Tr. 253, 367) She was instructed to follow up with Dr. Derum to obtain a different medication.  (Tr. 253, 367)

A mental residual functional capacity assessment was performed on June 13, 2008 by Joseph Mehr, Ph.D.  (Tr. 352)  Dr. Mehr documented that Dietz was moderately limited in her ability to understand, remember, and carry out detailed instructions. (Tr. 253, 350)  Dr. Mehr also noted that she was moderately limited in her abilities to interact appropriately with the

general public, to get along with co-workers, and to respond appropriately to changes. (Tr. 253, 351) Furthermore, Dr. Mehr documented that Dietz had pressured speech and high activity level but no history of hospitalizations. (Tr. 253, 352) He noted that Dietz was diagnosed recently with bipolar disorder based on her pressured speech and an appearance of anxiety. (Tr. 253-54, 352) Dr. Mehr recorded that Dietz likely would have some difficulty relating to others due to her rapid fire speech but that she did retain the capacity for general socially appropriate behavior in a setting with reduced interpersonal contact. (Tr. 254, 352) Dr. Mehr also opined that Dietz retained the capacity to remember locations and work related procedures as well as to understand and remember instructions for simple actions of the routine repetitive type. (Tr. 254, 352) Dr. Mehr found that Dietz retained sufficient attention and concentration to persist at and complete activities for periods of time greater than several hours. (Tr. 254, 352) She also retained the capacity to maintain a regular schedule and punctual attendance without special supervision and to complete a normal workday and week at regular acceptable pace. (Tr. 254, 352)

On July 16, 2008, a physical residual functional capacity assessment was completed by Marion Panepinto, MD. (Tr. 254, 361) It documented that Dietz had the ability to lift 20 pounds

occasionally and to lift 10 pounds frequently.  (Tr. 254, 355)

She was able to stand, walk, or sit for 6 hours with limited

push/pull in the upper extremities.  (Tr. 254, 355)  The

assessment also revealed moderate to severe tenderness to

palpation of the right wrist.  (Tr. 254, 355)  An MRI indicated a

finding consistent with full thickness partial tear of the

supraspinatus tendon which would limit her overhead lifting.

(Tr. 254, 355).

On July 18, 2008, Dietz followed up at Frances Nelson for

counseling.  (Tr. 254, 420)  She stated that she was doing well

on the Seroquel.  It was noted that she still talked fast and

loud and that she might need some ADHD medications to slow her

down.  (Tr. 254, 420)  Dietz continued to be seen for monthly

counseling.  (Tr. 254, 420)

Deitz then followed up with Dr. Kohler on July 30, 2008.

Dr. Kohler noted that Deitz had been restarted on a lower dose of

Seroquel.  (Tr. 254, 365)  She also recorded that Dietz had rapid

speech but that she was somewhat improved and not as hyper.  (Tr.

254, 365)  Dr. Kohler's diagnosis remained bipolar disorder, and

she instructed Dietz to continue in counseling.  (Tr. 254, 365)

On September 4, 2008, Deitz again saw Dr. Kohler.  (Tr. 254,

362)  Dr. Kohler documented that Deitz had adult ADD, which was a

fairly common comorbid condition.  (Tr. 254, 362)  Dr. Kohler

also noted that Deitz still was having problems with focus and that her affect still was somewhat rapid but improved. (Tr. 254, 362) Dr. Kohler's diagnoses were bipolar disorder and adult ADD. (Tr. 254, 362) Dietz's Serquel dosage was increased, and she also was prescribed the medication Strattera. (Tr. 254, 362).

Dietz followed up with Russell at Frances Nelson on September 12, 2008, for counseling. (Tr. 254, 420) Deitz seemed to be at a slower pace since she had started on the Strattera medication in addition to her Seroquel dosage. (Tr. 254, 420) She again followed up with Russell on October 21, 2008. (Tr. 254, 420) She was agitated and upset with the 17 year old son of her fiancé, who acted like he had Tourette's syndrome. (Tr. 254, 420) She explained that his tics were annoying and that she wanted to know how to deal with them. (Tr. 254, 420)

Dr. Kohler completed a Medical Opinion on November 3, 2008 regarding Dietz's ability to do work related activities because of her mental state. (Tr. 254, 375) Dr. Kohler documented that Dietz was limited severely in her abilities to maintain attention for 2 hour segments, maintain regular attendance and be punctual, work in coordination with or proximity to others without being unduly distracted, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from

12

supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and deal with normal work stress. (Tr. 254-55, 375-77) Dr. Kohler further documented that Dietz had a dual diagnosis of bipolar disorder and ADHD. Dr. Kohler recorded the following observations that led to this diagnosis: Dietz had limited socials skills and might be inappropriately loud in the work place; had paranoia and sensitivity to criticism; asked a lot of questions; never had been able to hold a job; talked in a loud voice and repeated herself; was hard to communicate with; and came across as odd with possibly some type of schizotype personality disorder. (Tr. 255, 377)

Dr. Kohler also completed a Mental Impairment Questionnaire for DDS on November 3, 2008. (Tr. 255, 378) DSM-IV diagnoses included: Axis I: Bipolar disorder, NOS and ADHD; Axis II: Schizotype personality disorder; and a Current GAF of 49. (Tr. 255, 378) Dr. Kohler noted that Dietz's symptoms included generalized persistent anxiety, difficulty thinking or concentrating, persistent disturbance of mood or affect, paranoid thinking or inappropriate suspiciousness, bipolar syndrome with both manic and depressive syndromes, hyperactivity, motor tension, emotional liability, easy pressure speech, easy

distractibility, sleep disturbance, and oddities of thought, perception, speech, and behavior. (Tr. 255, 379)  Dr. Kohler further noted that she believed Dietz had borderline intellectual functioning and that she had moderate difficulties in maintaining social functioning and marked deficiencies of concentration, persistence, and pace. (Tr. 255, 380)  Dr. Kohler also documented that Dietz's impairments would cause her to be absent from work about 4 days per month. (Tr. 255, 381)

On December 18, 2008, Dietz saw Dr. Genene Pettway Radden regarding bilateral wrist, hand, and shoulder pain. (Tr. 255) Dietz complained of shoulder and hand discomfort, numbness, and tingling. (Tr. 255)  Dr. Radden noted that the exam was basically unremarkable. (Tr. 255)  Dietz had a negative EMG/NCS, and inflammatory markers were negative. (Tr. 255)  Dr. Radden noted that the pain could be secondary to underlying non-inflammatory arthritis and prescribed her Lodine. (Tr. 255)

On December 18, 2008, Dietz had an x-ray of the bilateral shoulders and the bilateral hands. (Tr. 255)  These x-rays revealed no abnormal findings. (Tr. 255)

Then on February 6, 2009, Dietz followed up with Dr. Radden for a steroid injection to the left shoulder for treatment of her chronic pain. (Tr. 255)  She also had an x-ray of the cervical spine, which showed minimal diminished disc height at C4-C6 and

C5-C6 with minimal marginal anterior osteophyte formation.  (Tr.
255)  On February 23, 2009, Dietz began physical therapy for her
left shoulder, neck, and hand pain, which she continued through
March 18, 2009.  (Tr. 256)

On October 7, 2009, Dietz saw Russell at Frances Nelson.
(Tr. 256)  Russell documented that she had not seen Dietz for
about six months.  (Tr. 256)  Dietz told Russell that she had
been taking care of her parents who were ill.  (Tr. 256)  She
also stated that she had continued to pursue disability and had
hired a lawyer.  (Tr. 256)  Her lawyer told her that he thought
that she had a case but that she needed to get an opinion form a
psychiatrist and needed to be on medication.  (Tr. 256)  Russell
then noted that she was reluctant to do this just because the
lawyer wanted an opinion from a psychiatrist, and that her
primary care doctor had tried many things for Dietz, but that
none of them had worked.  (Tr. 256)  Russell noted that she would
refer Dietz to a psychiatrist.  (Tr. 256)

Dietz started seeing psychiatrist Dr. Graum Derum on October
27, 2009. Dr. Derum diagnosed Dietz with bipolar disorder,
generalized anxiety disorder, and R/O ADHD.  (Tr. 256)  Dr. Derum
prescribed her Geodan.  On November 4, 2009, Dr. Derum documented
that Dietz stopped taking the Geodon because her legs got
restless.  (Tr. 256)  Dr. Derum recorded that Dietz was loud with

rapid speech, had an animiated affect, and a hypomanic mood. His diagnoses remained bipolar disorder, NOS, generalized anxiety disorder, and R/O ADHD. (Tr. 256) Dr. Derum prescribed Abilify. (Tr. 256)

On November 17, 2009, Dr. Derum saw Dietz again. Dr. Derum noted that Dietz was calmer and not as hyper but that she still had racing thoughts and was anxious. (Tr. 256) Dr. Derum observed loud, rapid speech, an animated affect, and a hypomanic mood. (Tr. 256) His diagnoses were bipolar disorders, history of childhood seizures, and generalized anxiety disorder. (Tr. 256) Then, on December 1, 2009, Dr. Derum again saw Dietz and noted that she still was hyper, anxious, and worried. (Tr. 256) Dr. Derum's diagnoses remained unchanged, and her Abilify dosage was increased. (Tr. 256) On December 16, 2009, Dr. Derum documented that Dietz still was worrying a lot. (Tr. 256) He also noted that she was wearing mismatched clothes, had very tangential speech, and an odd affect with a hypomanic mood. (Tr. 256) Dr. Derum's diagnosis remained bipolar disorder. (Tr. 256) On January 12, 2010, Dr. Derum recorded that Dietz's speech was disorganized and rambling with odd affect. (Tr. 256) Dr. Derum's diagnosis remained bipolar disorder, R/O akathisia, history of childhood seizures, generalized anxiety disorder, and

R/O ADHD. (Tr. 256) Deitz was prescribed Abilify and Cogentin. (Tr. 256)

At the hearing before the ALJ, Dietz testified that she had several problems that kept her from working. (Tr. 24) She could not get along with co-workers. (Tr. 24) She explained that often she was nervous and late getting to work because she was afraid that her co-workers were talking behind her back. (Tr. 24) Her medications were sometimes helpful, but she experienced side effects such as headaches and anxiety. (Tr. 25) Dietz explained that she saw her psychiatrist, Dr. Derum, monthly and that he prescribed her medications. (Tr. 25) She also saw Russell, who was a counselor at Frances Nelson, about once every three months. (Tr. 25) Dietz stated that she also saw another doctor named Dr. Kohler. (Tr. 25)

Dietz testified that she normally woke up around 10:00 a.m. each day. (Tr. 26) She usually would sit around for about an hour or so and drink a cup of coffee. (Tr. 26) After that, she laid back down for a while until she got up to get something to eat. (Tr. 26) Dietz explained that she usually fixed her own meals. (Tr. 26) She did a little housework, including laundry and loading and unloading the dishwasher. (Tr. 26) She also performed other house chores such as vacuuming and bed making. (Tr. 27) Dietz testified that she went grocery shopping but that

17

she needed her fiancé to help her sometimes. (Tr. 27) She had trouble grocery shopping because she was very unorganized. (Tr. 32) She did not do any yard work or gardening. (Tr. 29)

Dietz further explained that she watched television but that often she did not remember what she watched because her mind was racing. (Tr. 27) She tried to read, but she insisted that she had to do a lot of things in moderation because she was unable to focus. (Tr. 27) Dietz further stated that she did not belong to any groups or organizations because she was afraid to go into public places. (Tr. 28) She did not have any friends around where she lived, and her family lived about 2 hours away. (Tr. 28) She visited her parents once every couple of months, and her fiancé normally drove there. (Tr. 28) She did not drive very often because she had a constant fear of getting into an accident. (Tr. 39) She testified that she did not see any other relatives because she thought that they did not want to be around her because of how she acted. (Tr. 29)

Dietz testified that the last time she drove was about a month earlier and that it was a quick trip to the store. (Tr. 29) Dietz did not have any hobbies or interests that she kept up with, but she did like walking outdoors when there was nice weather. (Tr. 29) She did not go fishing, camping, or do any

outdoor activities of that nature. (Tr. 29) However, if the weather was nice she would go walking outside. (Tr. 29)

Dietz testified that she took care of her personal hygiene and bathed and dressed herself. (Tr. 29) She had a computer and the internet but did not use email. (Tr. 30) She used the internet to play online games, but she explained that she did not use it often because she got very agitated. (Tr. 30) Dietz further explained that she had a cat at home but that she did not take care of it. (Tr. 30)

Dietz testified at the hearing that the last time she was out of the state was four of five months ago. (Tr. 31) She went to Las Vegas with her fiancé to see different shows and to view the scenery. (Tr. 31) Prior to that, the last time she was out of state was about five years ago. (Tr. 31)

Dietz then went on to explain the physical problems that she had. (Tr. 32) Her rotator cuff in her left shoulder caused her pain that came and went periodically. (Tr. 33) Because of this, she was unable to pick up heavy equipment or anything more than a gallon. (Tr. 32) She also had pain that came from her neck and radiated to her head and caused headaches if she lifted too much. (Tr. 33) Additionally, her arms got tingly and numb if she used them too much. (Tr. 33) This pain went into her hands often causing a burning or tingling sensation. (Tr. 33) This caused

her to have to put things down very fast or sometimes even drop them. (Tr. 33) Dietz also explained that when she lifted things the pain radiated down her left leg. (Tr. 34) She was able to stand in one spot for five to ten minutes and she could sit down for about thirty minutes, before she would have to get up and move around. (Tr. 38)

As far as emotional problems, Dietz testified that she got very nervous thinking about going to work. (Tr. 34) That nervousness caused her to be very irritable. (Tr. 34) When she was irritable, Dietz paced back and forth and got very jumpy. (Tr. 34) Dietz approximated that she paced about six or seven times in a usual two hour period. (Tr. 35) Her mind raced a lot, and she did not concentrate very well so she often had to be told to do something more than once. (Tr. 39) Dietz further stated that she talked very fast and that it had caused her to lose her job in the past. (Tr. 35) At some of her past jobs, she had gotten so nervous that it caused her to get upset and cry. (Tr. 36) She also stated that when she got upset her voice got louder. (Tr. 37) She had been fired for raising her voice and yelling at people. (Tr. 38) When asked if there was anything else she wanted to say to the ALJ, Dietz stated that she had a hard time getting along with people and being in public. (Tr. 40) She further stated that she got nervous and often tried to

20

make herself late for work so she would get fired from her job. (Tr. 40)

The next person to testify at the hearing was the VE. The ALJ posed a series of hypothetical questions to the VE. (Tr. 40-45) First, the ALJ asked the VE about the existence of jobs for a person of Dietz' age, education, work experience, and skill set that would not require over shoulder work, would be limited to jobs that did not require detailed or complex job processes, had little change in the job process from day-to-day, had no interaction with the public, and had no more than occasional interaction with others. (Tr. 41) The VE responded that those restrictions would eliminate all positions. (Tr. 41) The ALJ then changed the hypothetical to include unskilled entry level work. (Tr. 41) The VE responded that at the unskilled, light exertional level, the individual could be a collator, which fell under the category of clerical, as well as photocopying and microfilming. (Tr. 41) The VE explained that there were approximately 3,800 of these types of jobs in the state of Illinois and 53,000 nationally. (Tr. 41) The VE also stated that another type of job that would fit this hypothetical would be small assembly, which had approximately 2,100 jobs in the state of Illinois and 41,000 nationally. (Tr. 41) In addition, another job that the VE stated fit the hypothetical was

electronics assembly, in which there were approximately 1,600 jobs in Illinois and 47,000 nationally. (Tr. 41)

Next, the ALJ asked the VE to consider the same hypothetical, but with unskilled, sedentary examples. (Tr. 41) The VE responded that an individual would be able to perform jobs in electronics touch-up and circuit board touch-up. (Tr. 41) The VE explained that electronics touch-up had an estimated 1,200 jobs in Illinois and 52,000 nationally, while the circuit board touch-up had about 2,000 jobs in Illinois and 55,000 nationally. (Tr. 42) Another sedentary example that the VE provided was a document preparer, which had approximately 2,000 jobs in Illinois and 64,000 nationally. (Tr. 42) The VE stated that all the jobs described did not require the individual to speak or communicate clearly. (Tr. 44)

The VE then was asked to consider whether the individual in the hypothetical above would remain employed at the above mentioned jobs if she were to miss an average of four days a month. (Tr. 42) The VE responded that in his opinion the individual would not remain employed and that the individual would be able to miss at most two days a month. (Tr. 43) The VE further testified that the individual also would not be able to stand up and walk around for two to three minutes every hour. (Tr. 43) He explained that the unskilled, sedentary jobs

involved sitting, so in his opinion, standing up and walking around were not a part of those positions. (Tr. 43) Ultimately, the VE explained that having to stand up and walk around every hour would eliminate all of the positions mentioned in the above hypothetical. (Tr. 43) The VE then was asked to consider the above hypothetical if the individual was unable to accept criticism and tended either to cry or yell when given direction. (Tr. 43) The VE stated that in his opinion, it would be up to employer tolerance, but generally based on employment behavior it would not be acceptable. (Tr. 44)

The last person to testify at the hearing was William R. Maddem. (Tr. 45) Maddem stated that he was Deitz's friend. He clarified that although Dietz described him as her fiancé, it was better to say that at one time they were engaged but that the relationship was in question because of Dietz's issues. (Tr. 45) Maddem stated that he had known Dietz for about eight years and that he saw her daily. (Tr. 45) He explained that when he first met Dietz she seemed talkative, but relatively normal. (Tr. 46) He stated that as time went by, she became more talkative and was unable to concentrate, focus, or comprehend anything. (Tr. 46) Maddem explained that Dietz did not have a "get up and go attitude." (Tr. 46) He further stated that she reacted severely to even the smallest criticism and that she was paranoid. (Tr.

47)  She had a nervous energy and was not able to be in one place for an extended period of time.  (Tr. 47)  Maddem also stated that Dietz needed constant supervision and that she did not have a good memory.  (Tr. 48)

Maddem opined that he thought the Abilify was having a negative effect on her mood and often caused her to cry.  (Tr. 48)  He thought the medication had decreased her talkativeness but had dumbed down her cognitive process.  (Tr. 48)  He further stated that she was unable to concentrate or think straight on her medication.  (Tr. 48)  Maddem stated that Dietz tried to avoid crowds as well as driving or riding in a car.  (Tr. 49)  Ultimately, Maddem opined that he thought that Dietz was clingy and scared of herself.  (Tr. 51)  He concluded that she seemed to live inside her head and did not have a strong perception of reality.  (Tr. 51)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled.  (Tr. 57-58)  In step one, the ALJ found that Dietz had not engaged in substantial gainful activity since December 4, 2007, her alleged onset date.  (Tr. 58)  At step two, the ALJ found that Dietz had the following severe impairments:  attention deficit hyperactivity disorder, depression/bipolar disorder, anxiety, personality disorder, and degenerative disc and joint

disease. (Tr. 58) At step three, the ALJ found that Dietz's impairments did not meet or medically equal one of the listed impairments. (Tr. 59) In particular, Dietz's degenerative disc and joint disease did not meet or medically equal any Category 1.00 musculoskeletal impairments, and her mental impairments, considered singly and in combination, did not meet or medically equal the criteria of any category 12.02 attention deficit hyperactive disorder, category 12.04 bipolar/depression, category 12.06 anxiety, or category 12.08 personality disorder. (Tr. 59)

In determining Dietz's residual function capacity (RFC), the ALJ stated that she considered all symptoms and the extent to which those symptoms reasonably could be accepted as consistent with the objective medical evidence and other evidence. (Tr. 61) The ALJ found that Dietz had the capacity to perform light and sedentary work as defined in 20 C.F.R. §§ 404.1567 and 416.967. (Tr. 61) The ALJ concluded that the limitation to light and sedentary work was due to all her impairments and symptoms including her spine, shoulder, and hand pain. (Tr. 61) The ALJ further found that Dietz should not perform over the shoulder reaching due to left shoulder pain. (Tr. 61) Ultimately, the ALJ determined that Dietz was limited to work that did not require detailed or complex job processes; little in the way of changes in the job process from day-to-day; no interaction with

the public; and only occasional interaction with others due to moderate limitations in social functioning, concentration, persistence, and pace due to all her mental disorders combined. (Tr. 61)

In reaching this determination, the ALJ first discussed Dietz's mental health, noting that Dietz alleged in her application that she was disabled due to attention deficit hyperactivity disorder (ADHD) and depression. (Tr. 62) The ALJ noted that on December 4, 2007, Dietz had a mental status examination at Champaign County Christian Health Center, where she exhibited some paranoid ideations, but that she was not delusional. (Tr. 62) The provider was unsure if Dietz had ADHD or bipolar disorder and prescribed Ritalin and referred her to psychiatry. (Tr. 62)

The ALJ next discussed the follow up of Dr. Kohler at Frances Nelson Health Center on March 13, 2008. (Tr. 62) Dr. Kohler noted that Dietz was feeling fine and that her examination was unremarkable except for her rapid speech. (Tr. 62) Dr. Kohler diagnosed Deitz with bipolar disorder. (Tr. 62)

The ALJ then mentioned Dietz's physical impairments, noting that on April 15, 2008, a contemporaneous x-ray of her left shoulder revealed changes of the glenohumeral joint, but otherwise it was normal. (Tr. 62)

The ALJ went on to discuss the comprehensive psychological consultative examination performed by Dr. Kohen on May 21, 2008. (Tr. 62)  Dr. Kohen observed that Dietz could not sustain concentration and that her mood appeared to be anxious and "manicky" with some depressive feelings.  (Tr. 63)  The ALJ explained that the statement that Deitz could not sustain concentration may have been a valid observation at the moment. However, the ALJ concluded that the evidence as a whole, including her past work, did not establish that she would be unable to sustain concentration if the work was within her RFC. She also noted that this assessment was prior to her establishing herself on medication, which she reported had improved her condition.  (Tr. 63)  The ALJ also noted that during this examination, Dietz's speech was free of any delusional thought processes with no looseness of association, flight of idea, or circumstantiality noted.  (Tr. 63)

The ALJ next discussed Dietz's subjective complaints of right wrist pain, but noted that an x-ray demonstrated no fracture, dislocation, or osseous lesions.  (Tr. 63)

The ALJ then examined how Dietz's medications improved her conditions.  (Tr. 63)  On July 18, 2008, Dietz reported that she was doing well on Seroquel but that May 21, 2013her doctor decided to add some ADHD medication to her treatment regimen.

27

(Tr. 63) In August 2009, Dietz again reported that she was doing well on Seroquel and that she currently was volunteering at a nursing home. (Tr. 63) During a follow up on September 12, 2008, Dietz reported no problems with the Strattera that was added to her medication regimen. (Tr. 63)

The ALJ then went on to discuss the Mental Impairment Questionnaire submitted by Dr. Kohler at the behest of the Disability Determination Services. (Tr. 63) Dr. Kohler ultimately assigned Dietz a global assessment of function (GAF) score of 49, indicating serious symptoms, and further opined that Dietz's symptoms would cause her to miss work more than four days a month. (Tr. 64) The ALJ explained that she did not give controlling weight to Dr. Kohler's opinion for multiple reasons. (Tr. 64) The review of the progress notes since 2007 showed only subjective complaints regarding Dietz's rapid, excessive speech and anxiety, but there were no findings based on objective observations. (Tr. 64) The ALJ further explained that overall, Dr. Kohler's records and the records as a whole did not support her conclusions, and her opinion appeared to be sympathetic to help Dietz obtain disability. (Tr. 64) Additionally, the ALJ stated that Dr. Kohler did not explain why Dietz would miss work more than four days per month and that she made no link between the findings in her progress notes and the symptoms she

attributed to Dietz. (Tr. 64) The ALJ also mentioned Dr. Kohler's failure to indicate why Dietz could perform at the substantial gainful activity level in past jobs, perform volunteer work, help her ill parents, and perform other functions that she could not perform now. (Tr. 64)

The ALJ decided that more weight should be given to Dietz's actual functioning in daily activities and her ability to work in the past without establishing a significant diminution in her mental functioning since she had worked. (Tr. 64) The ALJ also explained that Dietz's other treating sources did not indicate in their treatment notes the level of limitations that Dr. Kohler suggested. (Tr. 64)

Next, the ALJ mentioned Dietz's physical examination of her hand on December 18, 2008, by Dr. Radden. (Tr. 64) Dr. Radden noted that Dietz had full range of motion and that x-rays of her bilateral hands and shoulders were normal. (Tr. 64)

The ALJ further discussed Dietz's mental health counseling follow-up on November 17, 2009. (Tr. 65) Madden noted that Dietz was much calmer and not as hyperactive. (Tr. 65) Dr. Derum observed that Dietz spoke in a loud, rapid manner with a hypomanic mood but that there was no evidence of psychosis or suicidal/homicidal ideations. In a follow up meeting in January 2010, Dr. Derum noted that Dietz presented herself with

mismatched clothing and bright pink eye makeup. (Tr. 65) The
ALJ noted that this type of behavior did not appear to be typical
behavior of Dietz as it had not been documented in the past.
(Tr. 65)

The ALJ next discussed Dietz's medical history as a whole.
(Tr. 65) She stated that Dietz's medical impairments reasonably
could be expected to cause some symptoms, however, Dietz's
statements regarding the intensity, persistence, and limiting
effects of these symptoms were not credible to the extent they
were inconsistent with the above RFC assessment. (Tr. 65) The
ALJ explained that Dietz's subjective statements regarding her
limitations were not supported by the objective medical evidence.
(Tr. 65) While Dietz's impairments limited her overall level of
functioning, the evidence did not establish that these
impairments were completely disabling. (Tr. 65)

Next, the ALJ noted that despite Dietz alleging severe hand,
shoulder, and cervical spine pain, she was able to perform
typical daily activities. (Tr. 66) She performed household
chores, cooked, did laundry, mowed the lawn, fed the cat, shopped
for groceries, drove a car, and attended to her own personal
hygiene. (Tr. 66) She also did some volunteer work and traveled
out of town to take care of her parents. (Tr. 66) The ALJ
reasoned that her ability to perform these daily activities

demonstrated that she was not disabled and that she was able to sit, stand, walk, lift light items, concentrate to complete tasks, and otherwise perform work within her RFC. (Tr. 66)

With respect to Dietz's mental conditions, the ALJ explained that they were described as serious but that the diagnosis was made while Dietz was dealing with the illness of her parents and problems with Madden's teenage son. (Tr. 66) She further explained that Dietz had not offered any credible evidence that her medication was not helpful in managing her mental impairments. (Tr. 66) The ALJ also considered the recent medical assessment provided by her psychiatrist, Corinne Kohler, where she noted that Dietz had a GAF score of 49. (Tr. 66) The ALJ explained that Dr. Kohler did not build an adequate bridge between her medical findings and any particular job related limitation. (Tr. 66) She further stated that Dr. Kohler presented no evidence other than the subjective statements of Dietz to establish any job related limitations. (Tr. 66) The ALJ stated that Dr. Kohler did not indicate why Dietz was able to work in the past but not now, or what effect Dietz's current medications had on her ability to work. (Tr. 67) Ultimately, the ALJ decided that Dr. Kohler's assessment was simply a document not consisting of any medical evidence and just prepared

at the request of Dietz to help her obtain disability benefits.
(Tr. 67)

    With the RFC determined, at step four the ALJ found that
based on vocational testimony Dietz could not perform her past
relevant work.  (Tr. 67)  At step five, the ALJ found that
considering Dietz's age, education, work experience, and RFC,
there were a significant number of jobs available in the national
economy and in the state of Illinois that she could perform,
including clerical/collator operation (3,800 jobs in Illinois),
small product assembler (2,100 jobs in Illinois), electronics
assembler (1,600 jobs in Illinois), as well as sedentary jobs in
electronics touch-up (1,200 jobs in Illinois)or as a document
preparer (2,000 jobs in Illinois).

## Discussion

    The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social
Security Act is limited to a determination of whether those
findings are supported by substantial evidence.  **42 U.S.C. §
405(g)**  ("The findings of the Commissioner of Social Security, as
to any fact, if supported by substantial evidence, shall be
conclusive."); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir.
2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th
Cir. 2003).  "Substantial evidence has been defined as "such

relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852, (1972) (*quoting **Consolidated Edison Company v. NRLB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *see also **Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Rice v. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. The claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A).** The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden

of establishing disability.  **20 C.F.R. § 404.1520**.  The ALJ first
considers whether the claimant is presently employed or engaged
in substantial gainful activity.  **20 C.F.R. § 404.1520(b)**.  If
she is, the claimant is not disabled and the evaluation process
is over.  If she is not, the ALJ next addresses whether the
claimant has a severe impairment or combination of impairments
which "significantly limits . . . physical or mental ability to
do basic work activities."  **20 C.F.R. § 404.1520(c)**.  Third, the
ALJ determines whether that severe impairment meets any of the
impairments listed in the regulations.  **20 C.F.R. § 401, pt. 404,
subpt. P, app. 1**.  If it does, then the impairment is
acknowledged by the Commissioner to be conclusively disabling.
However, if the impairment does not so limit the claimant's
remaining capability, the ALJ reviews the claimant's residual
functional capacity (RFC) and the physical and mental demands of
her past work.  If, at this fourth step, the claimant can
perform her past relevant work, she will be found not disabled.
**20 C.F.R. § 404.1520(e)**.  However, if the claimant shows that her
impairment is so severe that she is unable to engage in her past
relevant work, then the burden of proof shifts to the
Commissioner to establish that the claimant, in light of her age,
education, job experience and functional capacity to work, is
capable of performing other work and that such work exists in the

national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. §
404.1520(f)**.

Dietz raises three challenges to the ALJ's denial of
disability benefits: 1) that the ALJ improperly disregarded the
treating source opinion, 2) that the ALJ failed to present the VE
with a complete hypothetical, and 3) that the ALJ improperly
decided Dietz's credibility.  Dietz argues that because of these
defects, the ALJ made an erroneous decision that should be
reversed.

First, Dietz alleges that the ALJ improperly disregarded the
opinions of her treating psychiatrist, Dr. Corrine Kohler.
Specifically, Dietz alleges that the ALJ ignored the notes of Dr.
Kohler and made an assertion that was unsupported and contrary to
the record. Additionally, Dr. Kohler assigned Dietz a GAF score
of 49, which reflects a serious impairment and inability to work,
which the ALJ did not consider.

A treating source's opinion is entitled to controlling
weight if the "opinion on the issue(s) of the nature and severity
of [the claimant's] impairment(s) is well-supported by medically
acceptable and clinical and laboratory diagnostic techniques and
is not inconsistent with the other substantial evidence" in the
record.  **20 C.F.R. § 404.1527(d)(2);** *see also* ***Schmidt v. Astrue,***
496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d

467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *see also* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. **20 C.F.R. § 404.1527(c)(2); *Clifford*,** 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with her treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his his reasons for revising or rejecting evidence of disability."); *see e.g.*, *Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Once well-supported, contradictory evidence is introduced, the treating physician's opinion no longer is controlling, but it remains a

piece of evidence for the ALJ to weigh.  *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits. . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are."  *Hofslien*, 439 F.3d at 377. (internal citations omitted).

Here, after weighing all of the evidence of record, including physician opinions, the ALJ provided less weight to Dr. Kohler's opinions.  Dr. Kohler submitted treatment notes describing Dietz as consistently speaking rapidly at a high volume, having difficulty with focus and concentration, and appearing both anxious and hyper.  (Tr. 63)  Dietz claims that the ALJ erroneously dismissed these reports, explaining that they were based on Deitz's subjective complaints and were not supported by objective medical evidence.  Deitz argues that Dr. Kohler labeled a separate portion of her notes as objective findings, under which she explained her objective observations. (Tr. 269)

Although, Dietz argues that dismissing a doctor's opinion based on subjective complaints is erroneous, it is well established that "limited weight can be given to subjective allegations or to medical opinions that are based on subjective complaints." *Vincent v. Astrue*, 2008 WL 596040, at *8 (7th Cir. 2008). In one note, Dr. Kohler stated that Deitz appeared anxious, that she spoke continually with rapid run-on sentences, and that her voice escalated. However, in subsequent notes, Dr. Kohler simply recorded Deitz's complaints under the objective findings category. For example, she recorded that Deitz stated that she could not hold a job because she was anxious and worried she was going to lose her job when she got a job. (Tr. 300) Moreover, Dr. Kohler's objective observations appear to record improvements in Deitz's abilities over time. She reported that Deitz was fairly appropriate, alert, and oriented. (Tr. 300) Her speech was more controlled, and her conversation was appropriate although her speech was rapid. (Tr. 290) Overall, Dr. Kohler's objective findings, specifically those that did not recite Deitz's subjective complaints, were sparse, reported improvement, and did not support the limitations Dr. Kohler later assigned to Deitz. The ALJ's reliance on these shortcomings was well placed.

Dietz further argues that the ALJ did provide an adequate bridge between her findings and her opinion. Deitz complains that the ALJ failed to consider that she had trouble finding a correct medication regiment and that the ALJ never asked Dr. Kohler to provide support for her opinions. The mere fact that Deitz had trouble finding a correct medication regimen does not support Dr. Kohler's opinions that she was unable to work and was completely disabled. On July 18, 2008, Dietz reported that she was doing well on Seroquel but that provider opined that he might add some ADHD medication to her treatment regimen. (Tr. 63) In August 2009, Dietz again reported that she was doing well on Seroquel and that she was volunteering at a nursing home. (Tr. 63) During a follow up on September 12, 2008, Dietz reported no problems with the Strattera medication that was added to her medication regimen. (Tr. 63) Also, in October 2009, Dietz reported that she was traveling back and forth taking care of her sick parents. (Tr. 65) Additionally, in November 2009, Dietz's fiancé noted that she was much calmer. (Tr. 65) Thus, the ALJ's opinion that Deitz eventually found an effective medication regiment was well supported.

Deitz also argues that the lack of support for Dr. Kohler's opinions should not be held against her because the SSA questionnaire did not ask Dr. Kohler to tie her opinion to her

treatment notes, to explain why Deitz was capable of work in the past, or to explain her opinion that Deitz would miss more than four days of work per month. It is well established that in weighing the opinions of treating physicians, one of the factors that an ALJ must take into consideration is whether the physician supported her opinion with sufficient explanations. *Copeland v. Astrue*, 776 F. Supp. 2d. 828, 840 (7th Cir. 2011). Regardless of whether the questionnaire asked Dr. Kohler to link the medical evidence to her opinion, the ALJ sufficiently explained that there was both a lack of objective medical evidence to support the limitations and that there was no nexus between the observations in the notes and Dr. Kohler's limitations. The ALJ highlighted how the limitations Dr. Kohler reported in the questionnaire were extreme compared to the scarcity of observations and objective findings. The ALJ relied not only on Dr. Kohler's failure to provide an explanation in the SSA questionnaire but also her failure to provide the same in her treatment notes and observations. Together, the ALJ provided sufficient support for assigning less weight to Dr. Kohler's opinion.

Moreover, the ALJ pointed to Deitz's activities, including her volunteer work and caring for her ill parents, as contradictory to Dr. Kohler's strict limitations. One of the

factors the ALJ may take into consideration when assessing the
claimant's RFC is the claimant's daily activities. It was
appropriate for the ALJ to consider that Deitz was capable of
caring for her ill parents and volunteering when determining what
activities Deitz had the residual functional capacity to perform.
The ALJ found these activities inconsistent with the strict
limitations Dr. Kohler suggested  and noted so as a reason for
discounting Dr. Kohler's opinion.  Together, Deitz's daily
activities, effective medication, and lack of objective
observations supported the ALJ's ultimate conclusion to assign
less weight to Dr. Kohler's opinion.

Additionally, Dietz argues that the ALJ failed to consider
seriously the GAF score of 49 that Dr. Kohler assigned.  A GAF
score below 51 indicates a possible inability to keep a job**.**
**Bartrom v. Apfel**, 234 F.3d 1272 n.3 (7th Cir. 2000). However, the
ALJ noted that she assigned the GAF score less weight because Dr.
Kohler did not build an adequate bridge between her findings, and
the score was based primarily on subjective findings.  (Tr. 66)
It is important to note that "GAF scores are intended to be used
to make treatment decisions, ... not as a measure of the extent
of an individual's disability." **Martinez v. Astrue**, 2010 WL
1292491, at *9 (N.D. Ill. Mar. 29, 2010). "[N]owhere do the
Social Security regulations or case law require an ALJ to

determine the extent of an individual's disability based entirely on [his] GAF score." **Denton v. Astrue**, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted). Here, the GAF score was inconsistent with the medical findings that Dietz could perform volunteer work, help her ill parents, and perform other typical daily activities.  For the same reasons explained above, the ALJ provided sufficient support for discounting the GAF score that Dr. Kohler assigned to Deitz.  *See* **Knight v. Chater**, 55 F.3d 309, 313 (7th Cir. 1995) (instructing that an ALJ may discount medical evidence if it is internally inconsistent or inconsistent with other evidence).

Overall, with regard to Dietz's first challenge, it is evident that the ALJ did not improperly dismiss Dr. Kohler's reports, did properly conclude that Dietz's medications were having a positive effect on her conditions, and correctly weighed Dr. Kohler's opinions and GAF score, as they were inconsistent with the evidence as a whole and based primarily on Dietz's subjective statements.

Dietz's second challenge is that the ALJ failed to present the VE with a complete hypothetical.  Specifically, Dietz alleges that the ALJ erroneously found work for Dietz at Step 5 because she failed to incorporate all of Dietz's physical and mental limitations into the hypothetical.

The hypothetical that an ALJ poses to a VE "ordinarily must include all limitations supported by medical evidence in the record," including limitations imposed by depression. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). However, the hypothetical need not include all of a claimant's alleged impairments. *Jones v. Shalala*, 10 F.3d 522, 525 (7th Cir. 1993); *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540-41 (7th Cir. 1992). "All that is required is that the hypothetical question be supported by the medical evidence in the record." *Ehrhart*, 969 F.2d at 540.

The ALJ's hypothetical to the VE included unskilled entry level work with restrictions that the job not involve detailed or complex job processes or over the shoulder work, as well as avoided frequent change in job processes, interaction with the public, and more than occasional interactions with others. (Tr. 40-41) The VE replied with jobs that included collator, small product assembler, and electronics assembler. (Tr. 41) At the sedentary level, the VE listed jobs in electronic touch up, circuit board touch up, and document preparer. (Tr. 41-42) On cross examination, the VE was asked to consider the limitations that Dr. Kohler stated Dietz had, which included missing up to four days of work a month, inability to accept supervision or

criticism by supervisors, and the ability to get up every 45 minutes to walk around. (Tr. 43-44) The VE responded that such a job did not exist. (Tr. 44) Because the ALJ did not present these conditions to the VE, Dietz claims that she did not present the VE with a complete hypothetical.

The hypothetical question posed by the ALJ was proper because it reflected Dietz's impairments to the extent that the ALJ found them supported by evidence in the record. *Ehrhart*, 969 F.2d at 540. There is no requirement that the hypothetical include limitations not supported by the record and not incorporated into a well-supported RFC.

Dietz again argues that Dr. Kohler's limitations were supported by the evidence. However, as discussed above, the ALJ more than adequately explained why Dr. Kohler's opinions and conclusions were unsupported by the record, including because Dr. Kohler relied on subjective statements by Dietz and because she did not provide an adequate bridge between her medical findings and opinions. The ALJ explained that Dr. Kohler failed to explain why Dietz would miss any work, did not indicate why Dietz was able to perform certain daily activities, and provided little objective evidence. Thus, the ALJ gave more weight to the functioning demonstrated by Dietz's actual daily activities.

Dietz further argues that the daily activities the ALJ found that she performed were from a report in 2008, that her condition had worsened since then, and that the ALJ ignored Dietz's testimony before the ALJ. Dietz is correct in asserting that some of the daily activities that the ALJ referred to in her opinion were taken from a report in 2008. Dietz states that the report was from January of 2008, but it actually was dated October 1, 2008. Although Dietz testified in front of the ALJ that her condition had worsened, the ALJ was not required to add these restrictions to the hypotheticals posed to the VE because she found that Dietz's testimony was inconsistent with the record. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (holding that when a plaintiff's testimony before the ALJ was inconsistent with his daily activities and the medical evidence of record, that the ALJ was not required to give it controlling weight). There also was no evidence that supported Dietz's claim that the ALJ ignored her testimony. Rather, the ALJ took it into consideration with the evidence as a whole and assigned it less weight.

Since the 2008 report, there was medical evidence that Dietz's condition was improving. As mentioned above, the ALJ specifically focused on four separate occasions in 2008 and 2009 where the medical evidence indicated that Dietz's medications

were improving her condition. Because the evidence supports the fact that Dietz's condition had improved, the ALJ's reliance on the daily activities from the 2008 functioning report gave the benefit of the doubt to Dietz.

In addition, Dietz argues that her ability to do restricted activities at her own pace in her home environment was not inconsistent with an ability to perform full-time work. This assertion is correct. However, nowhere in the ALJ's opinion does she equate Dietz's daily household activities with her ability to perform full-time work. The ALJ merely considered the daily activities as a factor in determining Dietz's RFC. *See* **Spalding v. Astrue**, 2012 WL 3308881, at *4 (N.D. Ill. Aug. 13, 2012) (explaining that the ALJ may consider daily activities as factor in making her determination). The ALJ did not confine her disability determination to Dietz's activities of daily living. Rather, she conducted a thorough review of medical evidence, medications, and aggravating factors in assessing Dietz's impairments. *See* **Begley v. Astrue**, 2011 WL 3739339, at *3 (S.D. Ind. Aug. 23, 2011) (explaining that just because the ALJ mentioned the daily activities in his opinion did not mean that his opinion was based solely upon that). Therefore, it is clear that the ALJ did not equate Dietz's ability to perform daily activities with the ability to perform full-time work. Rather she

just took the daily activities into consideration in making her determination.

Dietz also argues that the VE's testimony actually and potentially conflicts with the ALJ's RFC because the ALJ's RFC precluded overhead reaching but that all of the jobs identified by the VE required frequent reaching. Dietz did not raise this conflict at the time of the hearing before the ALJ. *See **Overman v. Atrue***,546 F.3d 456, 463 (7th Cir. 2008) (explaining that on appeal, a claimant only can argue that a conflict was so obvious that the ALJ should have picked up on it without any assistance). Thus, the consequence of Dietz failing to raise this conflict at the hearing before the ALJ is that she now must show that the conflict was so obvious that the ALJ should have noticed it herself.

Deitz has not pointed to a direct conflict between the VE's testimony and the DOT and has failed to show that the conflict was readily apparent. The ALJ excluded jobs that required frequent *overhead* reaching in her RFC determination. It is true that the jobs identified by the VE require frequent reaching, but the DOT does not state that the positions demand reaching overhead. Because of this, the conflict was not obvious and direct as Deitz has suggested.

Courts in this circuit have found apparent conflicts only in far more obvious situations. *See, e.g.,* ***Overman,* 546 F.3d at 463–65** (finding an apparent conflict where the VE gave different answers regarding whether jobs were available for similar hypotheticals on direct and cross examination); ***Dross–Swart v. Astrue***, 872 F.Supp.2d 780, 798–801, 2012 WL 1946578, at *18–19 (N.D.Ind. May 30, 2012) (finding an apparent conflict where the ALJ determined the claimant could not be exposed to moderate noise, and the positions cited require exposure to moderate or loud noise). Less obvious conflicts have not been found apparent. *See, e.g.,* ***Russell v. Astrue***, 2012 WL 645937, at *16–17, (N.D.Ill. Feb. 24, 2012) (finding no apparent conflict where the ALJ asked whether jobs existed for a person who could perform only sedentary work with a sit/stand option but the DOT described sedentary work as including occasional standing and walking). Because, this is not an apparent conflict, this argument raised by Dietz must fail.

The third and last challenge that Dietz asserts is that the ALJ improperly decided Dietz's credibility. Specifically, Dietz argues that the ALJ improperly discredited her testimony before the ALJ regarding the intensity, persistence, and limiting effects of her condition.

This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility findings in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.")  The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilites rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. § 404.1529(a); *Arnold v. Barnhart*,**

473 F.3d 816, 823 (7th Cir. 2007) ("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); **Scheck v. Barnhart**, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. § 404.1529(c); **Schmidt v. Barnhart**, 395 F.3d 737, 746-747 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* **Indoranto v.**

***Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v.***

***Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is

disabling, the fact that its source is purely psychological does

not disentitle the applicant to benefits.")  Rather, if the

> [c]laimant indicates that pain is a significant factor
> of his or he alleged inability to work, the ALJ must
> obtain detailed descriptions of the claimant's daily
> activities by directing specific inquiries about the
> pain and its effects to the claimant.  She must
> investigate all avenues presented that relate to pain,
> including claimant's prior work record, information and
> observations by treating physicians, examining
> physicians, and third parties.  Factors that must be
> considered include the nature and intensity of the
> claimant's pain, precipitation and aggravating factors,
> dosage and effectiveness of any pain medications, other
> treatment for relief of pain, functional restrictions,
> and the claimant's daily activities.  (internal
> citations omitted).

***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994); *see also*

***Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ has discounted the claimant's

description of pain because it was inconsistent with the

objective medical evidence, she must make more than "a single,

conclusory statement . . . The determination or decision must

contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight."  SSR

96-7p, at *2. *See* **Zurawski**, 245 F.3d at 887; **Diaz v. Chater**, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, her analysis of the evidence). She must "build an accurate and logical bridge from the evidence to [his] conclusion." **Zurawski**, 245 F.3d at 887 (*quoting* **Clifford v. Apfel**, 227 F.3d 863, 872 (7th Cir. 2000)). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See* **Zurawski**, 245 F.3d at 888 (*quoting* **Bauzo v. Bowen**, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Dietz again argues that the ALJ should have given more weight to her testimony, that the ALJ relied on an outdated function report to determine the daily activities that Dietz could perform, that the ALJ relied solely on the fact that there was a lack of objective medical support to discredit Dietz's testimony, and that the ALJ equated Dietz's ability to perform daily activities with the ability to perform full-time work. Of these arguments, the only one the court has yet to address is

Dietz's argument that the ALJ discredited her testimony solely on the basis that it was not supported by objective medical evidence.

After a review of the ALJ's credibility determination, it cannot be said that the ALJ's determination was "patently wrong." There is no evidence that the ALJ completely ignored Dietz's testimony before the ALJ about her conditions. While an ALJ may not ignore subjective complaints of pain solely because they were unsupported by medical evidence, she was not obligated to accept those complaints at face value. *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005). Quite the contrary. She must consider the entire record in order to evaluate what weight to accord them. Social Security hearings "are not exempt from the basic axiom of experience that parties and witnesses will exaggerate when it is to their advantage." *Adams v. Astrue*, 880 F.Supp.2d 895, 905 (N.D. Ill. 2012); *Schmude v. Tricam Industries, Inc.*, 556 F.3d 624, 628 (7th Cir. 2009); *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006); *Brown v. Chater*, 87 F.3d 963, 965–66 (8th Cir. 1996). Thus, the ALJ was not bound to credit Dietz's complaints insofar as they conflicted with other, objective medical evidence in the record or her credibility was otherwise called into question by appropriate evidence, including discrepancies between objective medical or other evidence and

self-reports, which might contain evidence of symptom exaggeration. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

Indeed, despite the inherent difficulty of evaluating testimony about disability, an ALJ often will have solid grounds for disbelieving a claimant who testified that she had a complete disability. *Johnson*, 449 F.3d at 806. Numerous cases have confirmed that ALJs properly can reject unsupported claims of pain. *See, e.g., Cunningham v. Barnhart*, 440 F.3d 862, 864 (7th Cir.2006); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir.2005); *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir.2006).

In rejecting Deitz's testimony, the ALJ explained that the objective medical evidence did not support Deitz's testimony regarding her limitations. Specifically, the ALJ explained that the medical records did not demonstrate that Deitz had significant muscle atrophy, motor weakness, sensory loss, or reflex abnormalities. Because of this, the ALJ did not believe that her physical impairments rendered her disabled. The ALJ placed greater weight on Deitz's actual functioning than the activities to which she testified. The ALJ noted that Deitz performed household chores, attended to her personal hygiene, did some volunteer work, and cared for her parents among other activities.

Moreover, it is clear that the ALJ did not completely ignore Dietz's subjective complaints at the ALJ hearing because in her opinion the ALJ stated:  "[i]n evaluating the claimant's subjective complaints, the undersigned credits those complaints that diminish her capacity for basic work activities to the extent they are reasonably consistent with the objective medical evidence and evidence of the record." (Tr. 65)  The ALJ appropriately weighed the testimony by Dietz with the record as a whole in determining that she was able to perform certain limited jobs, and Dietz's challenge regarding the ALJ's credibility determination must fail. The ALJ pointed to sufficient factual support, and Deitz has not demonstrated that the ALJ's credibility assessment was patently wrong.

Overall, the ALJ correctly determined that some of Dr. Kohler's opinions were inconsistent and contradicted by evidence contained in the record as a whole, and she adequately articulated her reasons for crediting and rejecting the opinion evidence presented regarding Dietz's claimed disability. Additionally, in presenting her hypothetical to the VE, the ALJ appropriately included all of the limitations that were adequately supported by the record.  Finally, in making her credibility determination, the ALJ properly evaluated the evidence as a whole in determining the amount of weight to assign

Dietz's testimony.  Accordingly, the court recommends that the decision of the Commissioner be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties shall have fourteen days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. ***Willis v. Caterpillar, Incorporated***, 199 F.3d 902, 904 (7th Cir. 1999); ***Johnson v. Zema Systems Corporation***, 170 F.3d 734, 739 (7th Cir. 1999); ***Hunger v. Leininger***, 15 F.3d 664, 668 (7th Cir. 1994); ***The Provident Bank v. Manor Steel Corporation***, 882 F.2d 258, 260-61 (7th Cir. 1989); ***United States v. Johnson***, 859 F.2d 1289, 1294 (7th Cir. 1988); ***Lebovitz v. Miller***, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

ENTERED this 21st day of May, 2013

s/  Andrew P. Rodovich
United States Magistrate Judge